

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
SABRINA SANDERS,

                Plaintiff,

     - against -

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.
-------------------------------------------------X

**MEMORANDUM AND ORDER**
06-CV-1071 (NGG)

GARAUFIS, District Judge

Sabrina Sanders ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) to

challenge a determination of Michael J. Astrue, Commissioner of Social Security

("Commissioner"), denying her application for Social Security disability benefits. The court

now considers cross-motions for judgment on the pleadings. For the following reasons,

Plaintiff's motion is GRANTED, Commissioner's motion is DENIED, and the case is

REMANDED for the Commissioner to address the issues set forth below.

I.     **BACKGROUND**

    A.    **Procedural History**

On August 19, 1997, Plaintiff filed an application for Social Security Disability Benefits,

which was denied by the Social Security Administration. (Record ("Rec.") at 103-05, 122.[1])

Plaintiff requested a hearing for the purpose of reconsidering his application, which was held

before Administrative Law Judge Marilyn P. Hoppenfeld ("ALJ") on September 3, 1998. (Id. at

---

[1] "Rec." refers to the record filed with this court by the Commissioner. It contains
transcripts of hearings, ALJ rulings, and exhibits.

32.) On February 10, 1999, the ALJ found that Plaintiff was not disabled. (Id. at 14-24.) On March 16, 1999, Plaintiff requested a review of the ALJ's decision by the Appeals Council, which denied the request on April 14, 2000. (Id. at 9-10.) Plaintiff then appealed to this court, which reversed and remanded to the Appeals Council for further administrative proceedings. (Id. at 246-47.) The Appeals Council in turn remanded the case so that the ALJ could fully develop the record, proffer a copy of post-hearing evidence to Plaintiff with a letter explaining her rights regarding the evidence, appropriately reevaluate the opinions of Plaintiff's treating physician, and discuss Plaintiff's subjective complaints in light of the factors set forth in Social Security Ruling 96-7p. (Id. at 251-53.)

On January 8, 2002, a second hearing was held before the ALJ, at which Plaintiff was not present.[2] (Id. at 369, 373.) On March 25, 2002, the ALJ again found that Plaintiff was not disabled. (Id. at 235, 244.) On May 13, 2002, Plaintiff again requested review of the ALJ's decision by the Appeals Council. (Id. at 224.) The Appeals Council denied the request on January 11, 2006, thereby making the ALJ's decision final. (Id. at 217-19.) Plaintiff timely commenced this action on March 9, 2006. 42 U.S.C. § 405(g) (stating that an action must be commenced within sixty days of, or such time as the Commissioner may allow after, receiving notice of an unfavorable decision).

### B.    Plaintiff's History

Plaintiff was born on November 15, 1960 in New York City. (Id. at 39.) After a divorce, Plaintiff was given custody of her two daughters, aged thirteen and five. (Id. at 379.) Her

---

[2] Plaintiff's attorney contends, and neither party disputes, that Plaintiff gave him permission to represent her at the hearing.

education includes two years of community college. (Id. at 42-44.) Plaintiff worked as a secretary, a position in which she prepared financial chart presentations, performed significant amounts of typing and photocopying, and supervised other secretaries. (Id. at 380.) She alleges that she has been disabled since May 20, 1997, when she injured her back moving boxes of files out of her office and began suffering from back and leg pains, arthritis in her knees, and partial lack of vision in her left eye. (Pl. Br. 2.) She was 41 years old in December 2001, when she was last insured for benefits. (Id. at 128-29, 144.) Until then, Plaintiff had been receiving $300 per week in Worker's Compensation Benefits and $808 per week in Long-Term Disability Benefits. (Id. at 379.)

### 1. The Medical Record

### a. Treating Physicians

*Dr. Sarkis*

On June 17, 1997, Plaintiff was examined by Dr. Elie J. Sarkis, an orthopedic surgeon.[3] (Id. at 314.) Dr. Sarkis noted that Plaintiff had "tenderness in the left buttock and left lumbosacral region and left sacrosciatic notch." (Id. at 315.) Dr. Sarkis also noted that Plaintiff's "lateral bends are painful and restricted." (Id.) He determined from Plaintiff's CT scan (id. at 191) that Plaintiff had "moderate sized diffuse disc bulges at L4-5 and L5-S1," that she was disabled, and that "the prognosis for full recovery and function is guarded in view of the fact that these symptoms have a tendency to chronicity and exacerbation requiring further medical work-up and treatment" (id. at 315).

---

[3] After Plaintiff suffered her initial back injury, her family physician referred her to Dr. Sarkis.

On April 14, 1998. Dr. Sarkis noted that Plaintiff "continues to complain of pain in the low back radiating down both lower extremities to the level of the heels with occasional numbness and tingling."[4] (Id. at 349.) He noted continued tenderness in the lumbosacral region, "dizziness in flexing the trunk," and determined that Plaintiff was disabled. (Id.) He prescribed Tylenol #3 and continued physical therapy. (Id.) On May 14, 1998. Dr. Sarkis reported similar findings of pain and disability, and prescribed Ultram. (Id. at 345.) On June 15. July 13, August 6, September 10. and November 2, 1998, Dr. Sarkis noted nearly identical pains and limitations. (Id. at 341, 344, 346-48.)

On August 7, 1998. Dr. Sarkis filled out a worker's compensation form on Plaintiff's behalf. finding her disabled and unable to work. (Id. at 189.) On August 25, 1998. in a treating physician's report, Dr. Sarkis found "severe low back pain radiating down to lower extremities" and a herniated and bulging lumbar spine. (Id. at 187.) He noted that Plaintiff was unable to lift more than five pounds, stand and walk for more than one hour in an eight-hour workday, or sit for more than one hour, and had restrictions in reaching climbing. kneeling. stooping, and using machinery. (Id. at 188.)

On February 1 and 22, 1999, Dr. Sarkis made similar findings. also noting that Plaintiff suffered from sickle cell disease and used a TENS unit for pain relief. (Id. at 334-35.) On April 8 and 29, 1999. Dr. Sarkis further noted that Plaintiff suffered from bilateral carpal tunnel

---

[4] Although the typed physician reports on pages 333-351 of the record fail to specify that they were completed by Dr. Sarkis, their submission appears to have been a response to a subpoena sent to Dr. Sarkis. (Id. at 288.) Moreover. the examination methodology and write-up regarding Plaintiff's lumbar spine closely matches those of Dr. Sarkis's records dated June 17, 1997. (Id. at 315.) Plaintiff indicates that pages 331-368 of the record constitute treatment records from Dr. Sarkis. (Pl. Br. 4.)

syndrome and wore wrist braces at night. (Id. at 342-43.) On August 30, 1999, he observed pronounced radiating pain on Plaintiff's right side. (Id. at 336.) On October 14, 1999, Dr. Sarkis found more pronounced pains on her left side. (Id. at 333.) He also noted that Plaintiff had been "followed at the clinic for sickle cell." (Id.)

Dr. Sarkis made similar findings on January 20, May 22, July 20, and December 4, 2000. (Id. at 337-40.) On May 3, 2001, his findings remained consistent, but he noted more pronounced pain on the left side. (Id. at 331.) On July 5, 2001, Dr. Sarkis found more pronounced pain on the right side, tenderness and swelling of the right calf, and positive Homan signs. (Id. at 332.) On December 3, 2001, Dr. Sarkis filled out a second treating physician's report indicating a herniated lumbar disc, arthritis in the lower back, pain, tenderness, and motion limitation. (Id. at 303.) He wrote the words "totally disabled" across the residual functional capacity evaluation form. (Id. at 304.)

*Dr. Mechanic*

On November 12, 1998, upon referral from Dr. Sarkis, Plaintiff was examined by Dr. Alan Mechanic, a neurosurgeon. (Id. at 323-24.) Dr. Mechanic noted Plaintiff's history of sickle cell disease, radiating back pain, and arthritis of the knees. (Id. at 323.) Neurological testing proved unremarkable, indicating that Plaintiff was nonsurgical. (Id. at 323-24.)

*Dr. Duke*

In a treating physician's medical report dated October 8, 2001, Dr. William Duke diagnosed Plaintiff with sickle cell disease, multiple slipped disks, carpal tunnel syndrome, "status post right cerebrovascular accident," pneumonia, hypertension, and arthritis. (Id. at 305.) He noted that Plaintiff could carry a maximum of twenty pounds and could lift ten pounds on a

regular basis. (Id. at 306.) He also noted that Plaintiff could sit in one-hour blocks and stand and walk in thirty-minute blocks, each for a maximum of two hours per day. (Id.) Finally, Dr. Sarkis indicated that Plaintiff was limited in bending, climbing, and kneeling. (Id.)

## Dr. Flug

On a Worker's Compensation form dated August 22, 1997, Dr. David Flug indicated that Plaintiff had suffered vitreous hemorrhaging. (Id. at 174.) He concluded that Plaintiff required a "15 minute break after 45 minutes of work," and a blown up print size for reading. (Id.)

## Dr. Sivamurthy

On February 19, 1998, Plaintiff was admitted to the Jamaica Hospital Center for vertigo and weakness under the care of Dr. Shetra Sivamurthy. (Id. at 206-12.) CT and MRI scans were negative. (Id. at 201-02.) Dr. Sivamurthy opined that Plaintiff may have suffered an ischemic attack or low grade stroke. (Id. at 206.)

## Dr. Davis

In a letter to Dr. Sivamurthy, dated March 14, 1998, Dr. Uriel Davis, a neurologist, described Plaintiff's history of sickle cell disease, dizziness, and weakness and numbness in her upper extremities. (Id. at 193.) Dr. Davis diagnosed Plaintiff with vertigo and bilateral carpal tunnel syndrome. (Id. at 195.) On April 4, 1998, Plaintiff had an electromyograph and nerve conduction examination, which indicated decreased action potentials, motor latency, and conduction velocity. (Id. at 196-98.) Dr. Davis concluded that Plaintiff had bilateral carpal tunnel syndrome and required wrist splints. (Id. at 198-99.)

### b.    Consulting Physicians

*Dr. Swearington*[5]

Dr. Robert Swearington, an orthopedic surgeon, examined Plaintiff on September 9, 1997, and noted complaints of back pain. (Id. at 182.) Plaintiff's neck exam returned normal results. (Id.) She stood with her right leg unweighted. (Id. at 183.) Upon flexing her back more than ten degrees, Plaintiff developed pain and muscle spasms. (Id.) Dr. Swearington noted that a July 28, 1997 MRI of Plaintiff's lumbar spinal area indicated "a herniated nucleus pulposus at L5/S1." (Id. at 175, 192.) He concluded that Plaintiff had a marked disability and was unable to work, and recommended that Plaintiff pursue a more vigorous physical therapy program. (Id. at 183-84.)

Dr. Swearington examined Plaintiff again on December 18, 1997. (Id. at 175-79.) His findings were very similar to those based on the previous examination. (Id.) He noted that Plaintiff's condition was improving, though she was still moderately disabled, and once again recommended that Plaintiff pursue more aggressive physical therapy. (Id. at 178.) He concluded that Plaintiff could do only "very sedentary work . . . having to get up and move around and/or lie down for a short period at least every hour or so." (Id.)

*Dr. Seo*

On October, 21, 1997, Plaintiff was examined by Dr. Kyung Seo, a consulting orthopedist. (Id. at 158-59.) Dr. Seo noted pain and muscle spasms in the lower back from lateral rotation, flexion, and squatting. (Id. at 159.) He noted a normal range of motion in the

---

[5] Dr. Swearington examined Plaintiff at the request of her insurance company. (Id. at 322; Pl. Br. 5.)

hip, knee, and ankle joints. (Id.) He determined that an X-ray of Plaintiff's lumbar spine was "essentially normal except for mild sclerotic change of the facet joint at the level of L5." (Id. at 159-60.) Dr. Seo diagnosed Plaintiff with "[c]hronic muscle strain of the paraspinal muscles of the lower back" and indicated that Plaintiff could stand for one hour at a time, "walk several blocks," and lift twenty pounds. (Id. at 159.)

*Dr. Kleppel*[6]

On February 24, 1999, Plaintiff was examined by Dr. Noel H. Kleppel, who noted Plaintiff's history of sickle cell disease, back injury, bilateral carpal tunnel syndrome, and a fifty-percent decrease in peripheral vision of the left eye. (Id. at 325-26.) Dr. Kleppel described a report from Dr. Mones, a neurologist, indicating that Plaintiff did not have a neurological disease, but did have sickle cell disease with arthritic symptoms. (Id. at 326.) Plaintiff "ambulate[d] with a limping gait." (Id.) Dr. Kleppel noted pain and tenderness in the lumbar spinal area and flexion limitations, but no muscle spasm. (Id.) She concluded that Plaintiff was "capable of returning to some sedentary work not involving heavy lifting based only upon the 5/20/97 incident." (Id. at 327.) Noting Plaintiff's other limitations, Dr. Kleppel further concluded that "were the back injury alone her problem, as I indicated, she could return to work with the restriction of heavy lifting as noted." (Id.) Dr. Kleppel found that although Plaintiff's current course of treatment and therapy was not yielding sufficient results, it should nonetheless continue. (Id.)

---

[6] Plaintiff was examined by Dr. Kleppel at the request of Plaintiff's insurance company. (Id. at 325; Pl. Br. 7.)

On November 10, 1999, Dr. Kleppel produced findings similar to those based on the examination conducted on February 24, 1999. (Id. at 317.) Dr. Kleppel noted that Plaintiff had been seeing Jerome Blatt, a chiropractor, three times a week.[7] (Id. at 316.) Dr. Kleppel concluded that Plaintiff "continues to have minimal partial disability as a result of the back injury, but has greater problems with disability as a result of her sickle cell disease, cartilaginous degeneration of her knees, a recent stroke and visual difficulties. . . . With her minimal partial disability, she is capable of returning to sedentary work and might be able to work as a secretary were it not for her other problems." (Id. at 318.)

Dr. Kleppel examined Plaintiff for a third time on June 28, 2000. (Id. at 328-30.) She noted that Plaintiff was still under the care of Blatt, who had provided a series of handwritten reports. (Id. at 328-29.) She also noted that Plaintiff was wearing a back brace. (Id. at 328.) Dr. Kleppel reported somewhat milder pain and flexion limitations than those observed during her previous two exams. (Id. at 329.) She opined that Plaintiff's course of physical therapy and chiropractic treatment had not significantly improved Plaintiff's condition and that further treatment was unlikely to yield much benefit. (Id.) Dr. Kleppel reiterated that Plaintiff's other ailments markedly enhanced her disability beyond those resulting from her back injury. (Id. at 330.) She noted that Plaintiff was "anxious to return to some work activity" and recommended that Plaintiff undergo vocational rehabilitation in order to find work consistent with her disability. (Id.)

---

[7] There appear to be no treatment reports from Jerome Blatt in the record.

## Dr. Zoltan

Dr. Robert Zoltan, a consulting opthamologist, examined Plaintiff on October 22, 1997. (Id. at 161.) Dr. Zoltan noted Plaintiff's history of sickle cell disease, retinal hemorrhages, and laser scarring. (Id.) He found 20/20 vision in the right eye and 20 25 vision in the left. (Id.) His ultimate prognosis was guarded, noting that Plaintiff's field of vision was less than thirty degrees in both eyes. (Id.)

## Dr. Buonocore

In a Residual Functional Capacity Assessment dated November 5, 1997, Dr. A. Buonocore, a consulting expert, opined that Plaintiff could lift twenty pounds occasionally, lift ten pounds frequently, stand for at least two hours per day, and sit for roughly six hours per day.[8] (Id. at 163.) He indicated that Plaintiff had no push/pull, manipulative, or balancing limitations but had occasional limitations climbing, stooping, kneeling, crouching, and crawling (Id. at 163-65.) On February 12, 1998, Dr. Buonocore further indicated that Plaintiff had "thirty degrees less visual field," and that her "field efficiency equal to 20.5% does not meet listing 2.04" of Appendix 1 of 20 C.F.R. Pt. 404 Subpt. P. (Id. at 165, 170.)

## II.    DISCUSSION

### A.    Standard of Review

Pursuant to 42 U.S.C. § 405(g), the District Court's review of the Social Security Administration's final decision denying SSDI benefits under 42 U.S.C. § 423 is limited. The Court may consider only (1) whether there was substantial evidence in the record to support the

---

[8] The report was signed by both Dr. Buonocore and a Dr. C. Ladopoulos. (Id. at 120, 169.)

Commissioner's findings and (2) whether the findings were based on legal error. Shaw v. Carter, 221 F.3d 126, 131 (2d Cir. 2000); Wagner v. Sec'y of Health and Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). "Substantial evidence" is defined as "more than a mere scintilla–evidence that a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938)); accord Wagner, 906 F.2d at 860.

### B.    The ALJ's Decision

When the Appeals Council denies a claimant's request for review, the decision of the ALJ becomes "the final decision of the Commissioner." 20 C.F.R. §§ 404.981, 416.1481; see also Perez v. Chater, 77 F.3d 41, 44 (2d Cir. 1996). The Social Security Administration requires the ALJ to use a five-step sequential analysis to determine whether a claimant is "disabled" and entitled to benefits. 20 C.F.R. § 404.1520(a)(4); see also Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 1999). The ALJ must first determine whether the claimant is currently engaged in substantially gainful work activity. 20 C.F.R. § 404.1520(a)(4)(i), (b). Second, if the claimant is not engaged in such activity, the ALJ must then determine whether the claimant has a severe impairment that limits his or her work-related activities. Id. § 404.1520(a)(4)(ii), (c). Third, if such an impairment exists, the ALJ must determine whether the impairment meets the criteria found in Appendix 1 of 20 C.F.R. Pt. 404 Subpt. P. ("Listings of Impairments"). Id. § 404.1520(a)(4)(iii), (d). Fourth, if the impairment does not meet those criteria, the ALJ, using the standards of residual functional capacity as described in 20 C.F.R. § 404.1520(e), must determine whether the impairment prevents the claimant from performing his or her past work. Id. § 404.1520(a)(4)(iv), (f). Fifth, if the claimant cannot perform past work, the ALJ must,

11

under 20 C.F.R. § 404.1545, determine whether the claimant's impairment allows for performance of other work. Id. § 404.1520(a)(4)(v), (g). If it does not, the ALJ will find the claimant to be disabled. In conducting this analysis, the ALJ must consider "all evidence in the administrative record." Id. § 404.1520(a)(3).

In this case, the ALJ found that Plaintiff was not disabled under the Social Security Act. The ALJ first noted that Plaintiff failed to attend her hearing, although her attorney appeared on her behalf and agreed that testimony from the previous hearing would apply. (Id. 235.) The ALJ then noted Plaintiff's personal and work history, finding at Step One that Plaintiff had not engaged in work activity since the alleged onset of her disability. (Id. at 244.) Drawing from Plaintiff's testimony at the previous hearing, the ALJ summarized Plaintiff's May 20, 1997 accident, which had resulted in Dr. Sarkis prescribing a back brace, TENS unit, and physical therapy. (Id. at 236.) The ALJ then described Plaintiff's February 1998 ischemic attack and the episodes of extreme weakness and muscle spasm that occur every two to three years. (Id.)

The ALJ recounted Plaintiff's original testimony that she was able to walk only two to three blocks, stand for only ten to fifteen minutes at a time, and sit for only one and a half hours before feeling back pain. (Id.) The ALJ also recounted Plaintiff's statements that she had no left side vision and was not able to write for long periods of time. (Id.) The ALJ then noted Plaintiff's daily activities and her July 1998 trip to Florida. (Id.)

At Steps Two and Three, respectively, the ALJ concluded that Plaintiff's impairments were "severe" but failed to satisfy one of the Listings of Impairments. (Id. at 244.) Describing medical records provided by Dr. Sarkis, the ALJ noted consistent findings of "equal reflexes bilaterally and no motor or sensory loss." (Id. at 237.) The ALJ also found that although Dr.

12

Sarkis opined that Plaintiff was totally disabled, it was not clear whether he was referring to "her long-term disability insurance or any other definition of disability."[9] (Id. at 237.)

The ALJ then described Dr. Kleppel's findings, noting that "the lumbar area revealed no kyphosis, lordosis or scoliosis . . . no spasms were noted . . . [and] [m]uscle power and sensation of the lower extremities were normal and reflexes were equal." (Id. at 237-38.) The ALJ noted Dr. Kleppel's finding that Plaintiff was capable of returning to sedentary work,[10] and her encouragement of Plaintiff to "pursue vocational rehabilitation."[11] (Id. at 238.)

The ALJ then considered Dr. Duke's treating physician report and found that "[n]o objective laboratory work or findings were submitted to support his assessment." (Id.) The ALJ noted Dr. Flug's report, Plaintiff's June 1997 CT scan, and Plaintiff's July 1997 MRI, which according to the ALJ, superseded the CT scan "by the more intensive clinical impression it provided" (Id.) The ALJ also noted Plaintiff's "unremarkable" February 1998 CT scan and MRI. (Id. at 239.)

---

[9] The court does not find a lack of clarity here. Dr. Sarkis filled out two distinct forms indicating that plaintiff was completely disabled: one was a form for the State of New York Worker's Compensation Board (id. at 189) and the other was a Treating Physician's Medical Report (id. at 187-88), which is commonly used to apply for Social Security Benefits.

[10] Dr. Kleppel explicitly stated that if only Plaintiff's back had been injured, Plaintiff would be able to perform sedentary work, but that Plaintiff had a number of other ailments that caused further disability. (Id. at 318. 327.)

[11] The ALJ also described a report recently created by Dr. G. Cruz, a psychiatrist. (Id. at 238.) Noting that there had been no previous indication of any mental disorder, the ALJ "considered [the report] a recent fabrication." (Id.) At it turns out, the report appears to pertain not to Plaintiff, but rather to one Ellen Simone. (Id. at 309.) Plaintiff and Commissioner both note this in their briefs. (Pl. Br. at 24; Def. Br. at 13). It is not clear how this report made its way into the record.

13

The ALJ considered Dr. Swearington's report, noting that Plaintiff was "improving with conservative treatment," could "sit for long periods of time," and had a moderate disability. (Id.) She also considered Dr. Seo's report, indicating his assessments of Plaintiff's ability to sit, stand, and carry objects. (Id.) She noted Dr. Zoltan's finding that Plaintiff had retinal hemorrhages, laser scarring, and a restricted field of vision. (Id.) The ALJ then noted that Dr. Buonocore's findings were consistent with Plaintiff's ability to perform light work. (Id. at 240.) She further found that despite Dr. Davis's diagnosis of carpal tunnel syndrome, that condition would not preclude Plaintiff from all work activity. (Id. at 241.)

The ALJ ultimately determined that Plaintiff could "lift and carry twenty pounds occasionally, ten pounds frequently, sit stand and walk up to six hours per day and push and pull," and "could perform a full range of sedentary work for the period in question." (Id. at 240.) She further found that "the vocational expert testified to a number of jobs claimant could still perform with [] limitations" on vision, writing, and wrist movement. (Id.) The ALJ indicated that she considered "the opinions of various physicians," but that "they were not supported by any objective medical evidence and contradicted by claimant's activities." (Id.) The ALJ further found that Plaintiff was "not restricted in her daily activities." (Id. at 242.) Specifically, the ALJ noted Plaintiff's ability to "read the paper, watch television and relax on the sofa, without any unrelenting pain interfering." (Id. at 241.) The ALJ also noted Plaintiff's ability to cook, shop once a month, do the dishes, drive three times a week, and pay the bills. (Id.) The ALJ found such activities to be "consistent with at least light or sedentary work activity" and to "contradict any claim of persistent debilitating pains." (Id.)

14

Moreover, the ALJ found that the treating physician opinions "are not consistent with the other substantial evidence of record . . . contradicted by the substantial evidence . . . and not entitled to controlling weight." (Id. at 240.) She indicated that although there is some evidence to support Plaintiff's alleged back pain, Plaintiff had "no motor, sensory or reflex abnormalities . . . has undergone only conservative treatment . . . [and] no atrophy." (Id. at 241.) The ALJ also found that "one would expect some neurological residuals but none have manifested." (Id.)

The ALJ took note of Plaintiff's sickle cell diagnosis, but found that "no laboratory confirmation was submitted." (Id.) Further, as a result of the sickle cell disease, the ALJ found no "acute episodes . . . treatment nor hospitalization . . . [nor] extended periods of signs and symptoms." (Id.)

At Step Four, the ALJ, in accordance with the testimony of a vocational expert, determined that if Plaintiff was able to perform a full range of sedentary work, she could perform her past work as a secretary. (Id.) At Step Five, assuming that Plaintiff could not perform her past work, and taking into account Plaintiff's age, education, and residual functional capacity of "a significant range of light work," the ALJ found that Plaintiff could perform a number of jobs, such as a receptionist, usher, ticket taker, messenger, and surveillance monitor. (Id. at 243.) The ALJ concluded that Plaintiff was therefore not disabled. (Id.)

### C. Plaintiff's Claims

#### 1. Failure to Comply with the Remand Order of the Appeals Council

Plaintiff argues that the ALJ failed to put forth specific reasons for finding that Plaintiff was able to perform light work, particularly when rejecting the opinion of Dr. Sarkis. (Pl. Br. 13-14.) Under 42 U.S.C. § 405(g), the findings of the ALJ at Step Five are upheld only when

15

supported by substantial evidence. See Shaw, 221 F.3d at 131; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). The Second Circuit has held that an ALJ must provide "affirmative evidence" that demonstrates a claimant's ability to perform a specific category of work. Rosa v. Callahan, 168 F.3d 72, 80 (2d Cir. 1999) (holding that an ALJ who merely determined that physician reports appeared consistent with a claimant's ability to perform sedentary work has not supported his determination with substantial evidence).

The Second Circuit has further held that, in the process of determining a claimant's residual functional capacity, an ALJ "is required to explain the weight it gives to the opinion of a treating physician." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(d)(2)). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Id.; see also Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998). In providing such reasons, the ALJ must look to the totality of the evidence in the record. See Lopez v. Sec'y of Health and Human Servs., 728 F.2d 148, 150-51 (2d Cir. 1984); Lamar v. Barnhart, 373 F. Supp. 2d 169, 176 (E.D.N.Y. 2005) (holding that an ALJ had not supported his determination with substantial evidence in adopting the findings of a physician that were inconsistent with the bulk of the evidence in the record).

When evaluating a claimant's residual functional capacity in light of her activities, an ALJ may not infer that an ability to perform certain activities on an occasional basis indicates the ability to perform such activities for sustained periods of time. See Balsamo v. Chater, 142 F.3d 75, 81-82 (2d Cir. 1998) (claimant's ability to periodically attend church, assist with shopping, and drive does not preclude a finding of disability); Carroll v. Sec'y of Health and Human

Servs., 705 F.2d 638, 643 (2d Cir. 1983) (claimant's occasional ability to read, watch television, and ride the bus and subway does not preclude a finding of disability).

In this case, the ALJ failed to support her finding that Plaintiff was not disabled with substantial evidence. She provided three main reasons in support of her finding: (1) that Dr. Buonocore's findings were "consistent with light work," (2) that the opinions of the other physicians "were not supported by any objective medical evidence," and (3) that Plaintiff's activities "contradict any claim of persistent debilitating pains . . . [and] are consistent with at least light or sedentary work activity." (Id. at 240-41.)

The ALJ gave no specific reasons for crediting the opinion of Dr. Buonocore over those of the other physicians; rather, she merely found a general lack of "objective medical evidence" in support of the treating physician opinions. (Id. at 240.) Moreover, when discussing the findings of the other physicians, the ALJ considered neither the evidence in the record as a whole nor the evidence in support of those findings. For example, she noted that Dr. Sarkis consistently found "equal reflexes bilaterally and no motor or sensory loss" (id. at 237) but she failed to note consistent findings of pain and tenderness in the lumbo-sacral area and that "lateral bends are painful and restricted" (id. at 315). The ALJ considered Dr. Kleppel's findings of "minimal partial disability" and Plaintiff's ability to "return[] to sedentary work" (id. at 238) but failed to note that such findings were based only on Plaintiff's back injury and that Plaintiff proved to be significantly more disabled when her other impairments were taken into account (id. at 318). The ALJ also considered Dr. Swearington's findings of a "normal neck," "no spasms," "full motion," and "mild pain and pressure of the back but with no sensory loss" (id. at 239) but failed to note that muscle spasms occurred when Plaintiff flexed her back more than ten

17

degrees (id. at 183). Finally, the ALJ pointed to a lack of "objective laboratory work or findings" to support Dr. Duke's finding that Plaintiff was limited to sitting, standing, and walking in one-hour blocks for up to two hours per day (id. at 238) but failed to consider Dr. Swearington's report indicating that Plaintiff could sit for only an hour at a time (id. at 178) or Dr. Seo's assessment that Plaintiff could stand for only one hour at a time (id. at 159). Thus, when weighing the evidence against a finding of disability, it appears that the ALJ cherry-picked from the record rather than looking to it as a whole.

In finding that Plaintiff's activities contradicted her claims of disability and debilitating pains, the ALJ noted that Plaintiff "does cook and sometimes her mother and sister or daughter help her . . . shops once a month . . . does the dishes," reads the newspaper, watches television, attends church, and drives locally. (Id. at 241.) The ALJ concluded that "[t]hese activities are consistent with at least light or sedentary work activity." (Id.)

However, at the hearing held on September 3, 1998, Plaintiff testified that she spends most of her time going to doctors' appointments and physical therapy (id. at 67); she drives no more than ten to fifteen minutes to her appointments (id. at 50); and that her mother cooks dinner, her daughter performs most cleaning and household chores, and she receives help from her mother and daughter when shopping (id. at 68). Thus, not only is the ALJ's description of Plaintiff's activities somewhat misleading, there is no evidence that such activities are inconsistent with a finding of disability, nor is it clear that Plaintiff could perform such activities during a regular work schedule.

## 2. Improper Rejection of Plaintiff's Treating Physician Opinion

Plaintiff argues that the ALJ failed to give appropriate weight to the opinion of Plaintiff's treating physician. (Pl. Br. 17-23.) The Second Circuit has held that the opinion of a treating physician is binding on the Commissioner if it is supported by substantial medical evidence and is not inconsistent with other substantial evidence. Rosa, 168 F.3d at 78-79; Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R § 404.1527(d)(2)). To overcome the binding weight normally given to a treating physician opinion, other evidence in the record must "substantially contradict" the treating physician opinion. Wagner, 906 F.2d at 862. In other words, a court must look to whether the treating physician opinion "is inconsistent with the record as a whole." Shaw, 221 F.3d at 134; see also Snell, 177 F.3d at 133.

An ALJ is not a doctor, and does not examine the claimant in her office. Accordingly, the Second Circuit does not allow an ALJ to "set his own expertise against that of a physician." Balsamo, 142 F.3d at 81; Wagner, 906 F.2d at 861 (holding that, as a layperson, an ALJ may not state that the absence of certain medical findings provide a reasonable basis on which to reject a physician's opinion). "[A] circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling in order to overcome a medical opinion." Id. at 862.

The ALJ failed to properly weigh the opinion of Drs. Sarkis and Duke, Plaintiff's main treating physicians. The ALJ found that the opinions of Plaintiff's treating physicians are "not supported by any objective medical evidence . . . [and] are not consistent with the other substantial evidence of record." (Id. at 240.) Dr. Sarkis's opinions are in fact supported by years of corresponding treatment records. As noted above, Dr. Duke's assessment finds support,

19

at least in part, in Dr. Seo's and Dr. Swearington's reports. Moreover, there is no indication that the opinions of Dr. Sarkis and Dr. Duke are inconsistent with any other evidence in the record except for Dr. Buonocore's report. Therefore, the ALJ improperly found that Plaintiff's treating physician opinions were unsupported and contradicted by the record.

Further, in determining that Plaintiff was not disabled, the ALJ noted that "[t]here are no motor, sensory or reflex abnormalities. . . . There is no atrophy." (Id. at 241.) "In view of the longstanding nature of the claimant's allegations, one would expect some neurological residuals but none have manifested." (Id.) Failure to exhibit certain signs or symptoms does not provide a sufficient basis for the ALJ, as a layperson, to find that Plaintiff was not disabled. The court therefore determines that the ALJ has not presented an "overwhelmingly compelling" reason for contradicting the finding of Plaintiff's treating physicians.

### 3.    Failure to Comply with HALLEX

Plaintiff argues that, in adding evidence provided by Dr. Sarkis after the January 8, 2002 hearing, the ALJ failed to "tender[] these records to Mrs. Sanders or her counsel, as required by HALLEX 1-2-7-1."[12] (Pl. Br. 23.)  Plaintiff further asserts that because she was not given the opportunity to respond to the new evidence, the case should be remanded. (Pl. Br. 24.)  The Second Circuit has yet to reach the question of "whether HALLEX provides an independent source of the Commissioner's duties to applicants." Pronti v. Barnhart, 339 F. Supp. 2d 480, 500 (W.D.N.Y. 2004); Tineo v. Barnhart, 10-Civ.-11636 (NRB), 2002 U.S. Dist. LEXIS 18339*, at 9 (S.D.N.Y. Sept. 30, 2002).  In this case, because there are other bases for remand, the court need not resolve this issue of first impression.

### 4.    Weighing Dr. Cruz's Report

As a final basis for remand, Plaintiff argues that the ALJ "substantially relied on" Dr. Cruz's psychiatric report when determining whether Plaintiff was disabled. (Pl. Br. 24-25.)  She maintains that because the report was irrelevant to Plaintiff, the ALJ should have disregarded the

---

[12] The Hearing, Appeals and Litigation Law ("HALLEX") manual is an internal SSA directive that "'defines procedures for carrying out policy and provides guidance for processing claims at the Hearing, Appeals Council and Civil Actions levels.'" Tineo v. Barnhart, 10-Civ.-11636 (NRB), 2002 U.S. Dist. LEXIS 18339*, at 9 (S.D.N.Y. Sept. 30, 2002) (quoting HALLEX I-1-01).  The relevant instruction provides:

> When an Administrative Law Judge (ALJ) receives additional evidence after the hearing from a source other than the claimant or the claimant's representative, and proposes to admit the evidence into the record, the ALJ must proffer the evidence, i.e., give the claimant and representative the opportunity to examine the evidence and comment on, object to, or refute the evidence by submitting other evidence, requesting a supplemental hearing, or if required for a full and true disclosure of the facts, cross examination the author(s) of the evidence.

HALLEX I-2-7-1

report altogether. (Pl. Br. 24.) In her decision, however, the ALJ specifically stated that "[t]his report was not given weight[.]" (Id. 238.) Thus, it appears that the ALJ did, in fact, disregard Dr. Cruz's report when finding that Plaintiff was not disabled.

## III.  CONCLUSION

For the reasons set forth above, the court REMANDS this case to the ALJ so that she can (1) adequately consider all relevant medical evidence to determine whether Plaintiff is disabled in accordance with 20 C.F.R. § 404.1520(3) and (2) provide good reasons for affording limited weight to the treating physician's findings in accordance with 20 C.F.R. § 404.1527(d).

So ordered.

Dated: July 23, 2007
Brooklyn, N.Y.

/signed/
NICHOLAS G. GARAUFIS
United States District Judge